**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

KENYA McNEILL,

                           Plaintiff,                           6:24-cv-1241
                                                                (ECC/CBF)

v.

OFFICE OF CHILDREN AND FAMILY
SERVICES,

                           Defendant.

---

Kenya McNeill, *pro se Plaintiff*
Elizabeth Lombardi, Asst. Att'y General, *for Defendant*

**Hon. Elizabeth C. Coombe, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

Plaintiff Kenya McNeill brought this action pro se against the Office of Children and

Family Services, a New York State Agency, alleging claims under Title VII.  Complaint (Compl.),

Dkt. No. 1.  Presently before the Court is Defendant's motion to dismiss the Complaint for failure

to state a claim.  Dkt. No. 10.  The motion is fully briefed, Dkt. Nos. 10-2, 13, 16.  For the following

reasons, Defendant's motion is granted, and Plaintiff's Complaint is dismissed with leave to

amend.

**I.      FACTS**[1]

Defendant operates a limited security residential center in Taberg, New York for girls aged

---

[1] These facts are drawn from the Complaint.  The Court assumes the truth of, and draws reasonable inferences from, the well-pleaded factual allegations, *see Lynch v. City of New York*, 952 F.3d 67, 74–75 (2d Cir. 2020), but does not accept as true any legal conclusions, *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

13 to 18 who have been adjudicated juvenile delinquents.[2]  Plaintiff worked at Defendant's Taberg facility in 2023 and 2024 as a "Yss." Compl. at 3, 8, 10.[3]  Although not specifically articulated in the Complaint, it appears that Plaintiff is a Black man.  *See id*. at 3, 8, 13.

On May 20, 2023, one of Plaintiff's coworkers, "Yss Ray," came to the unit that Plaintiff was working on, and "causes problems" with a resident, after the resident "was given expectations on her behavior."  Compl. at 3.  Plaintiff was later removed from the unit by another colleague, "AOD Owens."  *Id.*  Plaintiff was told that he could lose his job "because of what Yss Ray did." *Id.*

The next day, Plaintiff's supervisor, Nicole Jackson, told him "that Yss Ray should not have come" to the unit "and that she should" have listened to the staff that was assigned to the unit.  Compl. at 3.  In addition, "other senior Yss said the same thing" to Plaintiff after they found out what happened, and "you shouldn't be removed from unit when a youth complains about you because it empowers the girls to make false allegation to get staff off the unit."  *Id.* at 4.

On June 3, 2023, during dinner, Plaintiff "had to redirect" a resident, "for her volume," and as Plaintiff was explaining that the resident could receive "no's for her volume and behavior," "Ray injects into the conversation."  Compl. at 4.  Ray told the resident "a few times" "don't worry

---

[2]  The Court takes judicial notice of this fact on Defendant's website. *Taberg Residential Center for Girls*, Off. of Child. and Fam. Servs., https://ocfs.ny.gov/programs/rehab/facilities/taberg.php (last visited March 18, 2026); *see Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 167 (S.D.N.Y. 2015) (citations omitted) ("[F]or purposes of a 12(b)(6) motion to dismiss, a court may take judicial notice of information publicly announced on a party's website, as long as the website's authenticity is not in dispute and it is capable of accurate and ready determination"); *see also Finn v. Barney*, 471 F. App'x 30, 32 (2d Cir. 2012) (concluding "that the district court did not abuse its discretion in taking judicial notice of" websites and media reports).

[3] Unless otherwise noted, citations to page numbers refer to pagination generated by the Court's ECF (electronic filing) system.  Excerpts from the record are reproduced exactly as they appear in the original, and errors in spelling, punction, and grammar have not been corrected, unless otherwise indicated.

you're not getting any no's." *Id.* Plaintiff told the resident that "Ray does not dictate what I do." *Id.* Ray took the resident "to the comfort room." *Id.* "During the incentive, the girls were watching a movie," Plaintiff "was redirecting" the resident "for her volume," and "explained to her the expectation [he] had of her." *Id.* The resident "was very rude," "put her hand in [Plaintiff's] face," and "said ok." *Id.* Ten to 15 minutes later, the resident "was being loud again so [Plaintiff] redirected [her] and sent her to her room for five minutes." *Id.* By the time Plaintiff walked back, "Ray let [the resident] out of her room." *Id.* Plaintiff "got up and informed [the resident] she had to go back into her room." *Id.* She was "being rude to [Plaintiff] but went into the room." *Id.* Plaintiff asked Ray why she had let the resident out of her room, and Ray said "I feel she spent her time in her room." *Id.* Plaintiff did not respond. *Id.*

"Ray called for the AOD to come," and "Owens came." Compl. at 4. Owens asked Ray what happened, and Ray responded, "I don't know." *Id.* Plaintiff explained to Owens that Ray had been undermining him "in front of the girls," making his "job harder." *Id.* Ray's supervisor also came. *Id.* at 4; *see id.* at 5. Plaintiff explained that he had spoken to Ray's supervisor the day before. *Id.* at 4. Ray's supervisor asked what had happened, and Plaintiff explained that "Ray says disrespectful things" and explained "the tone she uses speaking to staff." *Id.* Owens told Plaintiff that he "need[ed] to be professional." Ray then interrupted and said "in a rude tone," "I have to use the bathroom, so if anybody wants to work," and left. *Id.* Plaintiff "immediately" said "you see what I mean about her mouth." *Id.* Plaintiff again told Owens and Ray's supervisor "how unprofessional" she is and that "she has a pattern of doing this." *Id.* When Plaintiff later saw Ray moving a television, he opened a door for her, and Ray left the television "in front of the door," and walked away. *Id.*

Ray "always interferes" whenever Plaintiff redirected residents or gave them expectations.

Compl. at 5.  The residents were "feeding into it," "giving [Plaintiff] an attitude," and "putting false allegations on [him]."  *Id.*

On June 4, 2023, Plaintiff "made a mistake" by saying a resident's "name instead of initials over the walkie talkie."  Compl. at 5.  Plaintiff's supervisor, Jackson, told him about his mistake, and Ray laughed at him.  *Id.*  Another Yss told Ray that that she had made mistakes too, and that he "had to correct you" and that "both of you are still new."  *Id.*  Later that night, that Yss and Ray had a "heated argument" causing Jackson to hold a meeting with all three of them.  *Id.*  Ray "starts raising her voice at [] Jackson about how she wants the description of Yss duties," and complaining about two Yss employees.  *Id.*  Jackson told Ray that she would "give her a copy of the walkie talkie policy," and the meeting ended.  *Id.*

On June 5, 2023, Plaintiff overheard a resident "while on her phone call with her mother passing messages to" Ray.  Compl. at 5.  Plaintiff "wrote a 2079 up about the interaction."  *Id.* The same day, around 10:30 p.m., Plaintiff asked Ray for help with a task, and Ray ignored him. *Id.* at 5.  Later, "Ray said . . . we collect inventory at 10:45 pm which we never do unless there's a code."  *Id.* at 5–6.

On June 8, 2023, Plaintiff, Jackson, Ray, Ray's supervisor, and "YC1 Jaime Murphy" met.  Compl. at 6.  Plaintiff said, "I did nothing to you Ms. Ray for you to be undermining me and being disrespectful in the way you talk to me" and, "I'm not the only coworker you been disrespectful too and informing the girls that they don't have to listen to me and making my workplace hostile."  *Id.*  Ray said "something that a resident said to her," and Jackson told Ray that the purpose of the meeting was to address her "behavior toward your coworker."  *Id.*  Ray "admits she undermines" Plaintiff, gave "a bs reason saying its communication problem" and Plaintiff disagreed.  *Id.*  After Ray apologized, Murphy asked Plaintiff if he accepted her apology,

4

and Plaintiff responded that he did not. *Id.* The meeting ended, but while Murphy was walking out he said to Plaintiff "remember when you called her a pedophile," and Plaintiff said that he did not remember saying that. *Id.* Plaintiff then distributed 2079 forms to Murphy and to Ray's supervisor. *Id.* "Shortly after this," Ray was moved to a different shift, and Plaintiff did not work with her "until end of august early September." *Id.*

On July 23, 2023, Plaintiff's "food was stolen." Compl. at 6. The next day, Plaintiff learned that Murphy "said he ate" Plaintiff's food, and he told Plaintiff that he would replace it. *Id.* "The 26th came I seen Mr. murphy at pre-shift, only thing he said to me was did I want to do a shift change." *Id.* On July 27th, Plaintiff "inform[ed] director Bolinski of the situation." *Id.* Bolinski "said no one should be touching another person food and that there's loose boundaries here." *Id.* "Assistant director Houghton" offered to talk to Murphy, and later that day, Houghton told Plaintiff "Sunday it will be taken care of." *Id.*

On Sunday, Murphy called Plaintiff to his office and handed him a pizza. Compl. at 6. When Plaintiff opened the pizza, he noticed that it had pepperoni, and he returned to Murphy's office, told him that he did not eat pork, and "walked out of the office." *Id.* Murphy told Plaintiff "he was trying to make it right." *Id.* Later that day, Murphy asked Plaintiff, "are you serious or are you playing with me about the pepperoni," and Plaintiff "answered him no I don't eat pork." *Id.*

The next day, Bolinski called him to his office "because of the pizza situation," and "here are some of the quotes 'if you think I'm paying another $25 dollars for another pizza you're out your f**ing mind,' . . . 'if you call the sheriff's I'll say I didn't do it and how will you prove it,' 'I could've walked you because of your serious allegations even if you didn't do it,' 'if I want to eat someone food, I'm going to eat it, and I deal with the consequences after,'" and "'this can't be a

5

learning situation?'" *Id.* at 7.  The situation was never "made satisfactory" by Plaintiff's standards, and he sent an email to Bolinski.  *Id.*

On September 23, 2023 as Plaintiff was leaving at 7:00 a.m. after a "double," he stopped to talk to "YSS Patterson" and Houghton approached,  "says hi and speaks to Patterson" but said nothing to Plaintiff.  Compl. at 7.  Plaintiff received two calls "from CSU" requesting he work overtime, and he declined both because they were not his preferred shift.  *Id.*  That afternoon, Houghton called Plaintiff and said, "there's no hours for me so don't come in for your shift that that myself, Murphy, or director Bolinsky will call you when there's hours available."  *Id.*  Plaintiff asked if this was related to "a resident putting a False allegation on me which resulted in a safety plan," a fact that Plaintiff learned the night before.  *Id.*  Houghton said no, and the call ended.  *Id.*

Plaintiff called back "a few minutes later," and Houghton "told CSU he was busy."  Compl. at 7.  Plaintiff called to speak to his union representative, and "CSU told [Plaintiff] there been codes all day and that they're busy."  *Id.*  Plaintiff called the next day to try to reach his direct supervisor and his union representative, because he "wanted to grieve the situation and needed to know how," and was told that "there was codes all day and they both was busy call back."  *Id.*  Plaintiff called again that night and said that he wanted to speak to Jackson, and he "was told that 'I don't know why everyone is being around the bush with you Mcneill we were left a note saying not to transfer any calls from you,'" and was told that he was "not allowed on the property."  *Id.*  The next day, Plaintiff sent emails to Bolinsky and the Commissioner of the Office of Children and Family Services "about the some of the issues and treatment [he] was dealing with" at the Taberg facility.  *Id.* at 7–8.  Plaintiff called the Commissioner's office and confirmed that his email was received.  *Id.* at 8.

On September 26, 27, and 28, 2023, "Anita Sapio" called Plaintiff "asking [him] about Yss

Ray and for the 2079 [he] wrote in June and how they're now investigating the issue." Compl. at 8. Plaintiff asked Sapio why he "was told there's no hours for me when they offering overtime on my shift." *Id.* Sapio did not give him a direct answer and said, "I don't know why they did that and your still an employee." *Id.* Plaintiff asked Sapio why he was "always being removed from the unit whenever a resident makes any allegation against me by AOD Owens even when there's no safety plan and it's empowering the residents to target me put false allegation on me to get me off the unit," and she "had no response." *Id.* On September 29, 2023, Sapio called Plaintiff and told him, "You been put back on schedule." *Id.*

On October 2, 2023, a resident told Plaintiff that Bolinsky and Houghton had called her to their office, "told her don't lie to us," and asked her if Plaintiff "hurt her and do she feel uncomfortable around Yss Mcneill." Compl. at 8. Later that month, during a conversation with Sapio at Taberg, Plaintiff told her about his conversation with the resident. *Id.* Sapio later called Plaintiff to the director's officer and "told Bolinski what [Plaintiff] said when it was supposed to be investigated, also they wanted to bring the youth into the office so they can tell her to her face she was a liar." *Id.* Plaintiff "was against that." *Id.*

On October 17, 2023, "AOD Wieliczka" left Plaintiff alone on the unit during an overnight shift even though he knew that Plaintiff was on a safety plan, and Plaintiff told Jackson later that day. Compl. at 8. Jackson told him "to write a 2079 on" Wieliczka "because [Plaintiff] can be fired if caught on camera by [himself]." *Id.* On November 21st, Wieliczka again left Plaintiff alone with the residents. *Id.* Owens was "made aware of situation immediately" and spoke to Wieliczka. *Id.* On December 6th, Wieliczka left plaintiff alone on the unit, and another Yss "has a long talk with [Wieliczka] about why you are leaving Mcneill alone knowing he's on a safety plan." *Id.*

7

On February 9, 2024, Murphy told Plaintiff that he was "a dead man walking." Compl. at 8. Plaintiff asked Murphy what he meant, and Murphy said that he was "referring to the guy from green mile."[4] *Id.* That day another Yss told him he was in a group of people "they want to be fired," including Jackson. *Id.* at 9.

On February 15, 2024 Plaintiff contacted the Equal Employment Opportunity Commission (EEOC) "about the harassment and discrimination at OCFS Taberg." Compl. at 9.

On March 1, 2024, Plaintiff found out that he was "being put in another department" and Houghton told him "that if one of [his] allegations comes back substantiated that [he] will be fired." Compl. at 9. Plaintiff also talked to Bolinski "about the situation," and Bolinski said, "I told you about the girls and the allegation when you started." *Id.* Later that day, Plaintiff was "injured by sitting in a chair which CSU Rizzo says to me earlier both chairs are messed up." *Id.* Plaintiff completed an accident report and left for the hospital. *Id.*

On March 5, 2024, Plaintiff had a follow up appointment where the "doctor puts [him] on restrictions and to be reevaluated in 7 days." Compl. at 9. Plaintiff sent "paperwork to facility." *Id.* On March 8th, Plaintiff asked for worker's compensation paperwork, and he was told that he would have the paperwork by March 11, 2024. *Id.* On March 11th, Plaintiff was "told this is not workers compensation and they are sending [his] case to the leave unit." *Id.* On March 15th, Plaintiff was "taken out of work 4/29/24." *Id.*

On May 17, 2024, Plaintiff called a "justice center investigator" about the "verdict of allegation" and was told it was "unsubstantiated verbally." Compl. at 9. On May 24th, Plaintiff

---

[4] The Court takes judicial notice of the fact that The Green Mile is a novel and movie with a central character who is a Black man on death row, because it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *See* Fed. R. Evid. 201; *see generally*, Stephen King, *The Green Mile* (1996).

had his "interview with the EEOC." *Id.* On June 3rd, Plaintiff received a "letter in mail from justice center saying [his] allegation 2/27/24 came back substantiated." *Id.* On June 6, 2024, Plaintiff called the justice center investigator and was told that "her boss decided to believe the witnesses." *Id.* On June 12th, Plaintiff received a call from his "workers compensation lawyer" regarding a determination about his benefits. *Id.* at 9–10. On June 15th, Plaintiff received a letter from Houghton stating that his "services [were] no longer needed at OCFS (Taberg facility) [Plaintiff] was fired for the second time." *Id.* at 10.

## II.    LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, "a complaint must provide 'enough facts to state a claim to relief that is plausible on its face.'" *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Although a complaint need not contain detailed factual allegations, it may not rest on mere labels, conclusions, or a formulaic recitation of the elements of the cause of action, and the factual allegations 'must be enough to raise a right to relief above the speculative level.'" *Lawtone-Bowles v. City of New York*, No. 16-cv-4240, 2017 WL 4250513, at *2 (S.D.N.Y. Sep. 22, 2017) (quoting *Twombly*, 550 U.S. at 555). A court must accept as true all well-pleaded factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *See EEOC v. Port Auth.*, 768 F.3d 247, 253 (2d Cir. 2014) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Where "a plaintiff is proceeding pro se, the complaint must be considered under a more lenient standard than that accorded formal pleadings drafted by lawyers." *Harrison v. New York*,

95 F. Supp. 3d 293, 313 (E.D.N.Y. 2015) (quotation and citation omitted).  The complaint must also be construed liberally "to raise the strongest arguments that it suggests."  *Costabile v. N.Y.C. Health & Hosps. Corp.*, 951 F.3d 77, 80 (2d Cir. 2020).  "Nonetheless, a *pro se* complaint must state a plausible claim for relief."  *Darby v. Greenman*, 14 F.4th 124, 128 (2d Cir. 2021) (quoting *Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013)).

## III.    DISCUSSION

### A.  Title VII Discrimination

Defendant argues that Plaintiff's discrimination claim for "unfair treatment" based on any protected characteristics should be dismissed because Plaintiff has not alleged nonconclusory facts that would link any adverse employment actions to his membership in a protected class. Defendant's Memorandum of Law (Def. Mem.) at 9–10, Dkt. No. 10-2.  Plaintiff responds by stating the legal standard for a motion to dismiss and asserting factual allegations that are not in the Complaint.  Plaintiff's Memorandum of Law (Pl. Mem.) at 1–6, Dkt. No. 13.

To "defeat a motion to dismiss . . . in a Title VII discrimination case, a plaintiff must plausibly allege that (1) the employer took adverse action against him, and (2) his race, color, religion, sex, or national origin was a motivating factor in the employment decision."  *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87 (2d Cir. 2015).  "[A]t the pleadings stage . . . a plaintiff has a "'*minimal* burden' of alleging facts 'suggesting an inference of discriminatory motivation.'"  *Id.* (quoting *Littlejohn v. City of New York*, 795 F.3d 297, 310 (2d Cir. 2015)).  "[A] plaintiff must allege that the employer took adverse action against her at least in part for a discriminatory reason, and she may do so by alleging facts that directly show discrimination or facts that indirectly show discrimination by giving rise to a plausible inference of discrimination."  *Id.* (citing *Littlejohn,* 795 F.3d at 310).

10

Here, assuming that Plaintiff has sufficiently alleged an adverse employment action, that is, his termination, he has not pled facts that directly show discrimination or give rise to an inference of discrimination. A plaintiff may raise an inference of discrimination "from circumstances including, but not limited to, the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge." *Littlejohn*, 795 F.3d at 312 (quotation and citation omitted). Plaintiff "is permitted to create a mosaic with the bits and pieces of available evidence that, taken together, support a plausible inference of intentional discrimination." *Buon v. Spindler*, 65 F.4th 64, 84 (2d Cir. 2023) (cleaned up) (quotation omitted); *see also Littlejohn*, 795 F.3d at 311.

Regarding a potential discriminatory statement theory, the Complaint alleges that Murphy said that Plaintiff was "a dead man walking," and Murphy explained that he was "referring to the guy from green mile." Compl. at 8. The Complaint does not, however, allege that Murphy was a supervisor, that he had any authority over Plaintiff, or that he was involved in any way in the decision to terminate Plaintiff. As a result, even assuming that viewing the allegations in the Complaint as true and drawing all reasonable inferences from those facts, the Complaint alleges that Murphy made a discriminatory statement, it does not sufficiently allege how that statement is evidence of a discriminatory motive by Defendant's employer. In addition, Murphy's comment is the only such allegation, and it is not part of other "bits and pieces of available evidence." *Buon*, 65 F.4th at 84. In sum, Murphy's comment on its own, without any allegation about his role at Plaintiff's employer or allegations about similar comments by others employed by Defendant, cannot support a plausible inference of intentional discrimination.

11

"Evidence showing disparate treatment of 'similarly situated employees' may support a finding that an 'adverse job action was a pretext for . . . discrimination.'" *Nambiar v. Cent. Orthopedic Grp., LLP*, 158 F.4th 349, 365 (2d Cir. 2025) (alteration in original) (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 43 (2d Cir. 2000)). However, the "comparator employee or employees must be similarly situated to [the plaintiff] 'in all material respects.'" *Collins v. Fed. Express Corp.*, No. 24-1478-cv, 2025 WL 1764809, at *3 (2d Cir. June 26, 2025) (quoting *Graham*, 230 F.3d at 39).

Regarding a potential comparator theory, Plaintiff's allegations are not very clear. For example, Plaintiff identifies many individuals he worked with, but other than acronyms that appear to refer to positions, Plaintiff does not explain what positions these individuals held or whether they were members of the same protected class as Plaintiff. The allegation that is closest to alleging facts that would permit an inference of discrimination based on disparate treatment is the description of Ray's behavior and the lack of consequences for her behavior. The Complaint does not, however, address whether Ray or any of the other named individuals have the same protected characteristics as Plaintiff. Accordingly, the Court cannot infer that Plaintiff was subject to disparate treatment based on any protected characteristics from the Complaint's allegations about how other employees were treated.

To the extent that Plaintiff articulated additional factual allegations in his opposition to the motion to dismiss, they will not be considered. *See Smith v. City of New York,* 12-cv-3250, 2013 WL 1903856, at *4 (S.D.N.Y. May 8, 2013) (citing *Jean-Laurent v. Wilkerson,* 461 Fed. App'x 18, 21–22 (2d Cir. 2012) (explaining that where *pro se* plaintiff offered factual allegations in his opposition to a motion to dismiss "the District Court was required only to address the sufficiency of the allegations actually made in the First Amended Complaint")). "Although courts are

permitted to consider factual allegations made in a *pro se* plaintiff's memorandum opposing a motion to dismiss such procedural latitude is not warranted in this case." *Id.* (citing *Braxton v. Nichols,* No. 08-cv-8568, 2010 WL 1010001, at *1 (S.D.N.Y. March 18, 2010)).  The motion to dismiss is therefore granted on this claim.

### B. Americans with Disabilities Act Discrimination and Failure to Accommodate

The Complaint does not specifically assert an Americans with Disabilities Act (ADA), 42 U.S.C. § 12131 *et seq*., claim, but, construing the Complaint liberally as required, Plaintiff's allegations that Defendant did not "provide reasonable accommodations for [his] disability" and that he was subject to "unfair treatment based on [his] . . . disability," suggest an ADA claim. Compl. at 11; *see McLeod v. Jewish Guild for the Blind*, 864 F.3d 154, 158 (2d Cir. 2017) (concluding that, "where [the plaintiff's] factual allegations supported claims under the well-known anti-discrimination provisions of the NYSHRL and NYCHRL, our existing precedent required the district court to construe [her] complaint as asserting claims under those laws, regardless of her failure to check the appropriate blank on a form complaint.").  Defendant argues that Plaintiff failed to allege a disability, or why any alleged impairment would qualify as a disability. Def. Mem. at 15.  Plaintiff responds by stating the legal standard for a motion to dismiss and asserting factual allegations that are not in the Complaint.  Pl. Mem. at 1–6.

"In general, plaintiffs who seek to state a claim for disability discrimination under the ADA must establish 'that (1) they are 'qualified individuals' with a disability; (2) that the defendants are subject to the ADA; and (3) that plaintiffs were denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or were otherwise discriminated against by defendants, by reason of plaintiffs' disabilities.'" *Durr v. Slator*, 558 F. Supp. 3d 1, 27 (N.D.N.Y. 2021) (quoting *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272–73 (2d Cir. 2003) (quoting 42

13

U.S.C. § 12132)).

To sustain a claim for a failure to accommodate under the ADA "a [plaintiff] must show that: '(1) [he] is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, [the plaintiff] could perform the essential functions of the job at issue; and (4) the [defendant] has refused to make such accommodations.'" *Noll v. Int'l Bus. Machs. Corp.*, 787 F.3d 89, 94 (2d Cir. 2015) (quoting *McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 97 (2d Cir. 2009)).

"To establish a disability, a plaintiff must: (1) 'show that she suffers from a physical or mental impairment'; (2) 'identify the activity claimed to be impaired and establish that it constitutes a major life activity'; and (3) 'show that her impairment substantially limits the major life activity previously identified.'" *Norman v. NYU Langone Health Sys.*, 492 F. Supp. 3d 154, 163 (S.D.N.Y. 2020) (quoting *Weixel v. Bd. of Educ. of City of New York*, 287 F.3d 138, 147 (2d Cir. 2002)). A physical impairment is "[a]ny physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems." 29 C.F.R. § 1630.2(h)(1). Major life activities are non-exclusively defined to include "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working," in addition to "the operation of a major bodily function." 42 U.S.C. § 12102(2).

To qualify as a disability, an impairment must "substantially limit[] the ability of an individual to perform a major life activity as compared to most people in the general population;" but "need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." 29 C.F.R. § 1630.2(j)(1)(ii). "The

14

term 'substantially limits' shall be construed broadly in favor of expansive coverage" and "is not meant to be a demanding standard." *Id.* § 1630.2(j)(1)(i).

The Complaint does not state a claim for ADA discrimination or failure to accommodate because it does not allege an impairment or how any impairment substantially affected any of Plaintiff's major life activities, and the Court will not consider the additional factual allegations Plaintiff included in his opposition for the reasons stated above. The motion to dismiss is therefore granted on this claim.

### C. Title VII Hostile Work Environment

The Complaint asserts a claim for a Title VII hostile work environment[5] based on a "continued pattern of unwelcomed behavior from coworkers (Caucasian) in workplace" including "Threats, unwelcomed jokes, conspiring to get me terminated." Compl. at 11. Defendant argues that this claim should be dismissed because the Complaint does not allege that any of the harassing conduct was based on any protected characteristics. Def. Mem. at 12. Plaintiff responds by stating the legal standard for a motion to dismiss and asserting factual allegations that are not in the Complaint. Pl. Mem. at 1–6.

"To establish a hostile work environment under Title VII . . . a plaintiff must show that the 'workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Littlejohn*, 795 F.3d at 320–21 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). "This standard has both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile

---

[5] The Complaint states a cause of action for "Harassment," Compl. at 11, but the briefs refer to a hostile work environment claim.

or abusive, and the victim must subjectively perceive the work environment to be abusive." *Id.* (quoting *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014) (citing *Harris*, 510 U.S. at 21–22)). In addition, "[t]he incidents complained of must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Id.* (quoting *Raspardo*, 770 F.3d at 114). Finally, when deciding "whether a plaintiff suffered a hostile work environment," courts "consider the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.* (quoting *Harris*, 510 U.S. at 23). A plaintiff must "demonstrate that she was subjected to the hostility because of her membership in a protected class." *Kiraka v. M&T Bank*, No. 6:18-cv-1264 (GLS/TWD), 2020 WL 1285632, at *4 (N.D.N.Y. Mar. 18, 2020) (quoting *Smith v. New York and Presbyterian Hosp.*, No. 18-cv-776, 2020 WL 777786, at *25 (S.D.N.Y. Feb. 18, 2020) and citing *Hussey v. N.Y. State Dep't of L./Off. of Atty. Gen.*, 933 F. Supp. 2d 399, 412 (E.D.N.Y. 2013) (dismissing the plaintiff's hostile work environment claim because she "failed to allege that any of the defendants' specific actions were motivated by discriminatory animus")).

The Complaint alleges several incidents that occurred at Plaintiff's workplace, but, like Plaintiff's Title VII discrimination claim, the Complaint does not allege facts that would permit an inference that any of these actions were motivated by discriminatory animus because of any protected characteristics. In addition, the Court will not consider the additional factual allegations Plaintiff included in his opposition for the reasons stated above. The motion to dismiss is therefore granted on this claim.

### D.  Title VII Retaliation

The Complaint asserts a claim for a Title VII retaliation: "Punished for complaining about Discrimination and contacting EEOC and OER, the different treatment I received from my non black coworkers."  Compl. at 3.  Defendant argues that this claim should be dismissed because the substance of Plaintiff's complaints is not clear, and the Complaint therefore does not allege facts that would establish that he engaged in protected conduct.  Def. Mem. at 16–17.  Plaintiff responds by stating the legal standard for a motion to dismiss and asserting factual allegations that are not in the Complaint.  Pl. Mem. at 1–6.

To allege a Title VII retaliation claim, "the plaintiff must plausibly allege that: (1) defendants discriminated—or took an adverse employment action—against him, (2) 'because' he has opposed any unlawful employment practice," *Vega*, 801 F.3d at 90 (quoting 42 U.S.C. § 2000e–3(a)), or "otherwise ma[de] a charge, testif[ied], assist[ed], or participat[ed] in any manner 'in an investigation, proceeding, or hearing,'" *Banks v. Gen. Motors, LLC*, 81 F.4th 242, 275 (2d Cir. 2023) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 62 (2006)).

"An employee's complaint may qualify as protected activity" when "the employee has a good faith, reasonable belief that the underlying challenged actions of the employer violated the law," that is Title VII.  *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) (quotation and citation omitted).  A plaintiff's belief is not reasonable, however, "simply because he . . . complains of something that appears to be discrimination in some form."  *Id.* at 15.  The plaintiff must believe that Title VII made the conduct illegal and that belief must be "reasonable and characterized by objective good faith."  *Id.* at 16 (quotation and citation omitted).

Here, the Complaint states that Plaintiff complained to the EEOC "about the harassment

and discrimination at OCFS Taberg," but does not identify the substance of that complaint.  Compl. at 9.  Similarly, the Complaint states that Plaintiff complained to "Anita Sapio," about why there were no hours for him and why he was "always being removed from the unit whenever a resident makes any allegation."  Compl. at 8.  But the Complaint does not allege that Defendant took either of these actions because of any protected characteristics.  Similarly, even assuming that a "2079" is some kind of grievance and that filing a 2079 could be a protected activity, Plaintiff does not allege that the 2079 included the description of a practice that Plaintiff had an objective good faith basis to believe was prohibited by Title VII.  Finally, as explained above, the Complaint does not allege that Plaintiff was the subject of discriminatory actions because of any protected characteristics.  As a result, it is not reasonable to infer that any of Plaintiff's complaints described conduct that Plaintiff would have an objective good faith basis to believe was prohibited by Title VII.  In addition, the Court will not consider the additional factual allegations Plaintiff included in his opposition for the reasons stated above.  The motion to dismiss is therefore granted on this claim.

## IV.    LEAVE TO AMEND

Although Plaintiff has not requested leave to amend, ordinarily, a court "'should not dismiss' a pro se complaint 'without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated.'"  *Jeanty v. Sciortino*, 669 F. Supp. 3d 96, 118 (N.D.N.Y. 2023) (quoting *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795–96 (2d Cir. 1999)); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires.").  Here, Plaintiff may file an amended complaint asserting all of his dismissed claims.

In any amended complaint, Plaintiff must clearly set forth the facts that give rise to his

18

claims, including identification of each individual who committed each alleged wrongful act, and explanation of their role and responsibilities.  Plaintiff should also reattach the EEOC letter.  In addition, Plaintiff should include all factual allegations in any amended complaint to ensure that the Court will consider them if Defendant moves to dismiss any amended complaint.  Finally, any amended complaint will replace the existing complaint; it must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the court.  *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) ("It is well established that an amended complaint ordinarily supersedes the original[] and renders it of no legal effect.") (quoting *Int'l Controls Corp. v. Vesco,* 556 F.2d 665, 668 (2d Cir. 1977).  Plaintiff should file any amended complaint within 30 days of this order.

## V.   CONCLUSION

For these reasons, it is hereby

**ORDERED** that the Defendant's motion to dismiss, Dkt. No. 10, is **GRANTED**; it is further

**ORDERED** that Plaintiff is granted leave to amend to the extent authorized in this Memorandum-Decision and Order, it is further

**ORDERED** that any amended complaint must be filed within 30 days of the date of this Memorandum-Decision and Order, it is further

**ORDERED** that, if Plaintiff fails to file an amended complaint within the thirty-day deadline, the Clerk of the Court is respectfully directed to close this case without further order from the Court; and it is further

**ORDERED** that the Clerk serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: March 24, 2026

Elizabeth C. Coombe
U.S. District Judge